NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent. It is a public record.

# United States Court of Appeals for the Federal Circuit

05-1423,-1528

STATE CONTRACTING & ENGINEERING CORPORATION,

Plaintiff-Appellee,

v.

CONDOTTE AMERICA, INC. (formerly known as Recchi America, Inc.),
THE MURPHY CONSTRUCTION COMPANY,
THE HARDAWAY COMPANY, HUBBARD CONSTRUCTION COMPANY,
BALFOUR BEATTY CONSTRUCTION, INC.,
COMMUNITY ASPHALT CORPORATION,
and HANSON PIPE & PRODUCTS SOUTHEAST, INC.
(formerly known as Joelson Concrete Pipe Company, Inc.),

Defendants,

v.

RICHARD S. ROSS, ESQ.,

Movant-Appellant.

_____

DECIDED: July 24, 2006

_____

Before MAYER, BRYSON, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge BRYSON. Concurring-in-part and
dissenting-in-part opinion filed by Circuit Judge DYK.

BRYSON, Circuit Judge.

This appeal arises from a dispute over attorney fees pursuant to a contingent fee contract in a patent infringement case. Attorney Richard S. Ross appeals from a decision of the United States District Court for the Southern District of Florida in Case No. 97-7014-CV that adjudicated his charging lien against State Contracting & Engineering Corp., and also awarded State Contracting attorney fees for its defense against Ross's charging lien litigation. We affirm.

I

In the mid-1990s, State Contracting found itself in a patent infringement dispute with the Florida Department of Transportation. State Contracting sought the advice of attorney John H. Faro, who advised State Contracting to pursue litigation. In May 1997, Faro drafted and signed an engagement letter, to which State Contracting subsequently agreed. In the engagement letter, Faro proposed that Ross would serve as co-counsel during the litigation. As for compensation, the letter provided that Ross and Faro

> are agreeable to the following arrangement:
>
> 1) Reduced hourly billing fee of $100 per hour, plus expenses; plus
>
> 2) A Contingent Fee, as set forth in the current Standard Florida Bar Contingent Fee Schedule, copy of Schedule and & [sic] Statement of Client Rights attached; less
>
> 3) A Credit of all attorney fees billed and collected against recovery at the time of settlement, however, in no event would the amount of the net fee for representation be less than one third of the value of the settlement to your Company.

In accordance with their oral agreement, Ross served as lead counsel. Faro performed substantial support functions, including serving as second chair at trial. Faro also handled daily operations during portions of the litigation.

05-1423,-1528                                    2

In 2003 Ross and Faro began to dispute the allocation of the total contingent fee. Although Ross proposed at least two amended versions of the fee contract, neither Faro nor State Contracting ever agreed to any of those proposed changes. In June 2003, Ross issued State Contracting an ultimatum, saying that he refused to work with Faro any longer. Because Ross was serving as lead counsel for trial and appellate proceedings in the case, and because trial and appellate deadlines were fast approaching, State Contracting acquiesced in Ross's demand and discharged Faro.

In October 2003 State Contracting entered a global settlement with the Florida Department of Transportation for a payment of $8 million. The settlement agreement provided that the Department would list State Contracting's patented design as a permissible design for use by its contractors. The agreement further provided that if any contractors chose to use the patented design, the contractor rather than the Department would be liable for any royalty payments to State Contracting.

Ross and Faro each filed a charging lien to recover their fees. Faro reached a settlement with State Contracting. That settlement provided for a payment of $1,100,000 to Faro (which was in addition to $222,900 in hourly fees already paid to him). Ross pursued his lien through a five-day hearing before a magistrate judge, who determined that he was entitled to half of the total contingent fee provided for in the engagement letter. The total contingent fee under the engagement letter, the magistrate judge found, was one third of $8 million. Ross was therefore awarded $1,094,483.34 (which was in addition to $238,850 in hourly fees already paid to him). Subsequently, the court awarded approximately $250,000 to State Contracting for fees that it incurred in defending against Ross's claim under the charging lien. Ross

appeals, challenging (1) the amount of his attorney fee award under the contingent fee contract and (2) the award to State Contracting of the attorney fees it incurred in defending against Ross's charging lien litigation.

II

State Contracting argues that this court lacks jurisdiction over Ross's appeal from the district court's decision on his charging lien. In State Contracting's view, once the underlying patent infringement claims were voluntarily dismissed with prejudice, the district court's jurisdiction over the suit was no longer premised on 28 U.S.C. § 1338, and so any appeal in the case after the voluntary dismissal should be taken to the Eleventh Circuit, not this court. We disagree. State Contracting's argument is based on a misreading of this court's case law.

A federal district court has supplemental jurisdiction under 28 U.S.C. § 1367 to hear disputes related to charging liens that are filed against that court's judgments. See, e.g., Broughten v. Voss, 634 F.2d 880, 883 (5th Cir. 1981) ("If, upon withdrawal, counsel is unable to secure payment for his services, the court may assume jurisdiction over a claim based on a charging lien over the proceeds of the lawsuit."); see also Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 444, 448 (2d Cir. 1998). Thus, the district court properly exercised jurisdiction over Ross's claim.

As for appellate jurisdiction, 28 U.S.C. § 1295(a)(1) provides that this court has jurisdiction over any appeal in a case from a district court in which the district court's jurisdiction "was based in whole or in part on section 1338." Section 1338 gives district courts exclusive jurisdiction "of any civil action arising under any Act of Congress relating to patents." The district court plainly had jurisdiction over the patent claims in

05-1423,-1528                          4

this case, having adjudicated the various patent claims until the case was ultimately resolved through settlement.

State Contracting argues that the district court lost jurisdiction under section 1338 when, as part of the settlement, the patent claims were dismissed with prejudice. State Contracting bases its argument on this court's decision in <u>Nilssen v. Motorola, Inc.</u>, 203 F.3d 782 (Fed. Cir. 2000). According to State Contracting, that case stands for the proposition that the "critical distinction" in determining whether section 1338 jurisdiction survives after the dismissal of all the patent claims is whether the dismissal was involuntary or voluntary. Although the dissenting judge in the <u>Nilssen</u> case advocated that approach, the majority expressly rejected the proposition, noting that the "voluntariness or involuntariness of a dismissal is not controlling." <u>Id.</u> at 784-85. Rather, the relevant distinction is whether the patent claims are dismissed with or without prejudice. If all the patent claims in a federal suit are dismissed <u>with</u> prejudice, the district court's jurisdiction over the entire case is still based in whole or in part on section 1338. However, if all the patent claims are dismissed <u>without</u> prejudice, the dismissal order is treated as an amendment to the original complaint, and because jurisdiction is determined based on that "amended" complaint, the district court's jurisdiction is not considered to be based in whole or in part on section 1338. <u>See</u> <u>id.</u>

Here, the patent issues were dismissed with prejudice pursuant to the 2003 settlement agreement. Thus, the district court continued to have jurisdiction of ancillary matters under section 1338. This court therefore has jurisdiction over the appeal.

III

Ross's first argument in this appeal is that the district court erred by refusing to conduct de novo review of certain findings of fact made by the magistrate judge. Ross objected to 28 of the magistrate judge's 93 findings of fact. Pursuant to 28 U.S.C. § 636(b)(1), and subject to any local rules, a party may file with the district court objections to a magistrate judge's proposed findings. Magistrate Rule 4(b) of the Local Rules of the Southern District of Florida requires such objections to "specifically identify the portions of the proposed findings . . . to which objection is made, the specific basis for such objections, and supporting legal authority." That requirement "facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. Unit B 1982). Thus, "[f]rivolous, conclusive, or general objections need not be considered by the district court." Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988).

With respect to 18 of Ross's objections, we agree with the district court that the objections were conclusory and general, and therefore we conclude that the district court was not required to entertain those objections. Four of Ross's objections merely assert that a particular finding was "contrary to the record evidence." See Ross's objections to ¶¶ 31, 39, 64, 82 of the magistrate judge's findings. Another 14 of the objections reference testimony or documentary evidence, but without specificity. See Ross's objections to ¶¶ 27, 28, 29, 46, 53, 57, 59, 60, 63, 66, 75, 87, 89, and 90 of the magistrate judge's findings. For example, several of the objections assert that a particular finding was "contrary to the evidence of record, including testimony of [certain witnesses]." In some of those instances, the "certain witnesses" are as many as three

different witnesses, and the objections do not cite any specific portion of the witnesses' testimony and do not discuss the testimony that supports the objections. The district court did not scour the testimony from the five-day hearing before the magistrate judge in order to determine whether any of that testimony supported Ross's objections, and we hold that the district court was not required to do so.

Moreover, we see little merit to the 18 objections noted above, and we therefore do not believe Ross was prejudiced by the district court's refusal to consider them. For instance, in ¶ 29 of the findings, the magistrate judge explained that Ross and Faro initially agreed to share equally in the work and the fee. Ross objected to that finding as contrary to the evidence. In his brief on appeal, however, Ross notes that he "had an initial verbal understanding with Faro . . . that if he and Faro each contributed equally to the representation, the contingency fee portion of the Agreement would be split." Thus, Ross does not seem to express any pertinent disagreement with the magistrate judge's finding.

With respect to the remaining 10 objections, Ross at least pointed to some specific evidentiary support for his objections. See Ross's objections to ¶¶ 20, 30, 36, 38, 40, 55, 56, 62, 81, 93 of the magistrate judge's findings. Yet even in those 10 instances, he has failed to explain what the proper findings should have been or how the challenged findings affected the outcome of his case. Nonetheless, State Contracting has not shown that Magistrate Rule 4(b) demands that sort of detail, and for that reason we assume for purposes of this appeal that the district court erred by refusing to entertain those 10 objections. As we explain below, however, each of those

10 objections either lacks merit or is irrelevant to the outcome of this case. Therefore, Ross was not prejudiced by the district court's refusal to consider those objections.

Five of the 10 objections do not provide any basis for rejecting the magistrate judge's findings. See Ross's objections to ¶¶ 20, 30, 38, 56, 93 of the magistrate judge's findings. For instance, Ross objects to ¶ 20 of the magistrate judge's findings "to the extent the finding fails to include Rule 4-1.5 as part of the 'Engagement Letter.'" However, ¶ 20 acknowledges that the four-page attachment of the Florida Bar Rules was part of the "contingency fee agreement," and the magistrate judge's other findings of fact and conclusions of law confirm that the magistrate judge considered the attachment to be part of the agreement. Indeed, in his discussion of ¶ 56 of the magistrate judge's findings of fact, Ross notes that "there is no dispute that Rule 4-1.5 is part of the contract." Similarly, Ross objects to ¶ 93 of the magistrate judge's findings as "contrary to the record." The portion of ¶ 93 to which Ross objects is the magistrate judge's statement that the parties "stipulated to the dismissal of Faro's charging lien." The record, however, includes a joint stipulation to that effect, which was signed by Ross. Ross has not provided the district court or this court with any explanation of why that joint stipulation might have been ineffective, and we therefore see no basis on which the district court could have sustained Ross's objection.

Three of Ross's objections pertain to findings that had no bearing on the magistrate judge's disposition. See Ross's objections to ¶¶ 55, 62, 81 of the magistrate judge's findings. For example, in ¶ 55 the magistrate judge simply recounts that at one time during their joint representation Faro contended that he should be entitled to between 45 and 55 percent of the contingency fee. Ross insists that that paragraph is

inconsistent with the magistrate judge's findings that Ross and Faro verbally agreed to split the contingency fee equally. Ross's objection merely highlights the fact that the magistrate judge did not rely on any of the findings in ¶ 55 to reach his conclusion in this case. Rather, ¶ 55 is provided as background information to explain how the dispute between Ross and Faro arose.

The remaining two objections pertain to ¶¶ 36 and 40 of the magistrate judge's findings, and to the question whether the "value of the settlement" included revenue from future royalty payments. Although the district court stated that all of Ross's objections were legally insufficient, the court gave considerable attention to the magistrate judge's key findings, and with respect to whether "value of the settlement" included revenue from future royalty payments, the court concluded that "the evidence does not support Ross's contention[s]." Thus, the district court considered the substance of Ross's factual contentions in this regard and rejected his contentions as unsupported by the evidence. Likewise, with respect to many of the other objections mentioned above, the district court addressed the magistrate judge's relevant findings of fact and concluded that Ross's contentions were not supported by the evidence. Thus, any error in the district court's refusal to expressly address Ross's objections to the magistrate judge's findings of fact did not prejudice Ross because the court's refusal did not affect the outcome of this case.

IV

Most of Ross's substantive challenges to the district court's decision boil down to a dispute as to the proper division of fees between Faro and Ross. Typically, such a dispute is litigated between the lawyers, as the client has little interest in how the fee is

split among lawyers.  See, e.g., Halberg v. Chanfrau, 613 So. 2d 600 (Fla. Dist. Ct. App. 1993); cf. Shupack v. Marcus, 606 So. 2d 466, 468-69 (Fla. Dist. Ct. App. 1992) (Schwartz, C.J., dissenting from denial of motion for rehearing en banc) ("It is of controlling significance that the clients' interests are not involved at all in this case. They have fully paid the contingency fee on the recovery, and no one, least of all the appellant Shupack, claims anything more from them. . . . [T]he sole issue is whether Shupack is entitled to any part of the fees already paid the other lawyers.").  A client's primary concern in a charging lien action is the total amount of the fee it must pay for legal services, regardless of how participating lawyers choose to split that fee.  Indeed, State Contracting was never clearly informed as to how Faro and Ross would split the contingent fee.  After settling the patent infringement suit, State Contracting notified the lawyers that it was prepared to pay the one-third contingent fee, and it presumed that Ross and Faro would sort out the proper division of the fee.  Ross's arguments largely overlook that fact.  Rather, Ross argues that he is entitled to a much larger share of the contingent fee, which would subject State Contracting to fees that would exceed its contractual contingent fee obligation.  We conclude that the district court properly rejected Ross's arguments.

A

Ross first argues that he is entitled to 75 percent of the total contingent fee under the engagement letter.  We disagree.  Four pages of the Florida Bar Rules were attached to the engagement letter, and the engagement letter provided that Ross and Faro agreed to a "Contingent Fee, as set forth in the current [attached Rules]."  The attached rules specify several fee splitting arrangements that are allowable and some

arrangements that are mandated under certain circumstances. Although the engagement letter does not reference any of those specific provisions, Ross contends that the engagement letter contemplates that the fee will be split according to Rule 4-1.5(f)(4)(D). That rule was among those attached to the engagement letter, and it provides that "in an action or claim for personal injury or for property damages or for death or loss of services resulting from personal injuries based upon tortious conduct of another," the lawyer assuming "primary responsibility" for the legal representation shall receive a minimum of 75 percent of the total contingent fee. As the district court explained, however, State Contracting's patent infringement suit is not based on personal injury or property damage. It is better characterized as an action for "damages arising in the commercial litigation context," which is another type of suit referred to in the rules. The comment to the rules specifically notes that Rule 4-1.5(f)(4) (i.e., the 75 percent requirement) does not apply to commercial litigation.

We conclude that the contract does not provide the basis on which the fee was to be split. The general reference in the engagement letter to the Florida Bar Rules does not specify or incorporate by reference any particular division of fees between Ross and Faro. By the terms of the contract, all that State Contracting agreed to was to pay one-third of its recovery as a contingent fee for the legal services provided by Faro and Ross. Thus, the district court did not err by rejecting Ross's assertion that the engagement letter entitles him to 75 percent of the contingent fee.

B

Ross next argues that he is entitled to the entire contingent fee contemplated in the engagement letter. In support of that argument, Ross points to Rosenberg v. Levin,

409 So. 2d 1016 (Fla. 1982), and Adams v. Fisher, 390 So. 2d 1248 (Fla. Dist. Ct. App. 1980). Ross reasons that under Rosenberg Faro is not entitled to recover any portion of the contingent fee contemplated in Ross and Faro's contract with State Contracting, and that under Adams any fee paid to Faro does not affect Ross's right to recover the entire contingent fee under the contract. Ross's argument would subject State Contracting to a total fee exceeding the contingent fee to which it agreed (i.e., State Contracting would be required to pay Faro the reasonable value of his services, and it would be required to pay Ross one-third of the value of its settlement). The decisions in Rosenberg and Adams do not support that outcome.

In Rosenberg, a lawyer contracted for a contingent fee but was discharged before the occurrence of the contingency. The Supreme Court of Florida held that "a lawyer discharged without cause is entitled to the reasonable value of his services on the basis of quantum meruit, but recovery is limited to the maximum fee set in the contract entered into for those services." Rosenberg, 409 So. 2d at 1017. The court was concerned that if a discharged attorney could recover his contractual contingent fee, then a client who discharged his lawyer might be required to pay two contingent fees—one to the discharged lawyer and one to a substituted lawyer. That result, the court ruled, would be contrary to the "overriding need to allow clients freedom to substitute attorneys without economic penalty." Id. at 1021. Rosenberg did not address the issue of compensation for a substituted attorney; in particular, it did not address the situation in which two lawyers represent a client under a single fee agreement and one of the lawyers is discharged while the case is pending.

In Adams, a Florida court addressed the issue of compensation for a substituted lawyer and concluded that when a client enters into a new contingent fee contract with a substituted lawyer, that lawyer's recovery is not necessarily offset by the quantum meruit obligation the client owes to a discharged lawyer. Adams, 390 So. 2d at 1251. Unless the substituted lawyer's contract contemplates such an offset, the client is required to pay "fees in excess of the original contingent fee, once to the discharged attorney in quantum meruit and again to the substituted attorney on a new contingent fee contract." Id. Adams is critically distinguishable from the present case, however, because in this case Ross and State Contracting did not enter into a new contingent fee contract after Faro was discharged. Nor is there any evidence or suggestion by Ross that there was a reformation of the original contingent-fee contract. Rather, based on the evidence of record, the court found that after Faro's discharge the parties continued to operate under the original engagement letter. Under that contract, State Contracting merely agreed to pay one-third of the value of its settlement in exchange for Faro's and Ross's legal services. The engagement letter thus included any fees owed for Faro's services. We therefore reject Ross's invitation to reform the contract to increase State Contracting's fee obligations beyond the amount to which it initially agreed. The district court properly held that Ross's right to recover must be offset by Faro's recovery.

C

Ross argues that even if his recovery must be offset by Faro's fee, Faro's proper fee is limited to the quantum meruit value of his services, which, according to Ross, is less than the $1,315,900 Faro received when Faro settled his attorney fee claim with

State Contracting.  Thus, Ross argues, he should be entitled to one-third of the value of the settlement less the reasonable value of Faro's services.

The problem with that argument is that the magistrate judge found that Faro and Ross agreed at the outset to split the contingent fee equally and never agreed to a different proportional split of the fee.  Under the terms of his agreement, Ross is therefore limited to a one-half share of the total contingent fee, as the district court held. While there might be circumstances in which an attorney in Ross's position could reasonably seek a larger share of the contingency fee notwithstanding his initial agreement to an even split of the fee—such as where his co-counsel abandoned the joint venture or was discharged by the client on the client's own initiative—this is not such a case.  To the contrary, the result for which Ross argues would be inappropriate in this case because, as the magistrate judge found, Faro was discharged at Ross's insistence and would not have been discharged otherwise.  Moreover, Faro was discharged in June 2003, after more than seven years of representing State Contracting and less than four months before the global settlement was reached in October 2003. As the magistrate judge observed, it would be inequitable under these circumstances to allow Ross to force the client to discharge Faro, to use Faro's discharge as a ground for avoiding his agreement to split the fee equally with Faro, and then to claim a larger share of the contingent fee for himself.

D

Finally, Ross argues that the "value of the settlement," which was the basis for the contingent fee contemplated in the engagement letter, includes—in addition to the value of any cash settlement—the value of any future royalties stemming from the

patents in suit. Based on that interpretation, Ross calculates the value of the settlement at nearly $16 million. We disagree with Ross's interpretation of the "value of the settlement."

First, it is unclear whether Ross disputes the magistrate judge's determination that there is ambiguity in the phrase "value of the settlement." His primary argument seems to be that even if there is an ambiguity, the magistrate judge should have resolved that ambiguity based on "well settled Florida contract law that provides that the best evidence of a party's contractual intent is the construction it puts on the agreement through its conduct." As explained above, Ross believes that Faro was entitled to no more than 25 percent of the total contingent fee in this case. Thus, in Ross's view, State Contracting's $1.3 million settlement with Faro shows that State Contracting understood the total "value of the settlement" to be nearly $16 million.

That argument is wholly unpersuasive. There is no evidence as to what led State Contracting to settle Faro's charging lien for the amount they agreed upon. There is no reason to assume that the amount Faro was paid in the settlement was in any way based on State Contracting's understanding of the "value of the settlement," and Ross has not pointed to any evidence that Faro's settlement was based on an assumption by State Contracting that the contract limited Faro's fee to 25 percent of the contingent fee.

Ross also argues that the amended engagement letter supports his interpretation of the "value of the settlement." In 1998, Faro and Ross suggested that State Paving Corp. (the previous owner of the patents in suit) should be joined as a plaintiff in the infringement suit. As a result, the engagement letter was amended in March 1998 to add State Paving Corp. as a client. The amended engagement letter notes that "the

parties have previously agreed to a formula for the division of net royalties, and other net revenues realized by [State Contracting] from its exploitation and/or enforcement of such rights (e.g., licensing)." Ross argues that the quoted statement refers to the fact that the contingent fee included a percentage of future royalties. The evidence of record, however, shows that the statement refers to a compensation agreement between State Contracting and State Paving Corp. There is no evidence that Ross and State Contracting had "previously agreed to a formula for the division of net royalties," and there is ample evidence supporting the magistrate judge's finding that that language in the amended engagement letter referred to an agreement between State Contracting and State Paving Corp. Moreover, the amended engagement letter provides that the "fee schedule set forth in the [original] Engagement Letter . . . shall remain in effect and the parties herein reaffirm the acceptance thereof." Thus, to the extent Ross argues that the amended engagement letter modified the parties' original understanding of the meaning of the phrase "value of the settlement," that provision in the amended engagement letter expressly refutes his argument.

Finally, to the extent Ross argues that the phrase "value of the settlement" unambiguously includes future royalty payments, we disagree. A charging lien "will attach only to the tangible fruits of the [legal] services" for which fees are sought. Correa v. Christensen, 780 So. 2d 220 (Fla. Dist. Ct. App. 2001). Future royalty payments were not a tangible fruit of State Contracting's settlement. In its settlement agreement with State Contracting, the Florida Department of Transportation merely agreed to list State Contracting's patented design as an acceptable standard for its contractors to use. The agreement provides that if any contractor chooses to use State

Contracting's patented design, any royalty fees will be paid by that contractor, and not by the Florida Department of Transportation. Ross has provided no plausible explanation as to how that clause in the settlement agreement amounts to a tangible fruit of the litigation, or how one might value that benefit for purposes of awarding some portion of the benefit as a contingent fee to Ross.

Florida law provides that it is unjust to hold a client liable for additional attorney fees based on a contract term that is ambiguous. Arabia v. Siedlecki, 789 So. 2d 380, 383 (Fla. Dist. Ct. App. 2001) ("An attorney must be clear and precise in explaining the terms of a fee agreement. To the extent the contract is unclear, the agreement should be construed against the attorney."). Here, the evidence of record indicates that at the time the engagement letter was executed, no one—not even Ross—contemplated that the "value of the settlement" included future royalty payments. Indeed, Ross did not propose his current interpretation of the phrase until after the litigation had ended, when he commented to State Contracting that Faro had an "interesting take" on the "value of the settlement" language in the engagement letter. Thus, we conclude that the district court properly limited the value of the settlement to $8 million, which was the cash settlement State Contracting received from the Florida Department of Transportation.

V

Finally, Ross contends that the district court erred by determining that State Contracting was the prevailing party in Ross's charging lien litigation and thus awarding attorney fees to State Contracting for its defense of Ross's claim. We affirm the district court's decision in that regard.

The engagement letter contains a fee provision expressly allowing Ross and Faro to recover attorney fees incurred as a result of any dispute pertaining to the engagement letter's fee arrangement. Ross and State Contracting both moved for attorney fees after the district court entered its final judgment in the charging lien litigation. The district court referred the motions to the magistrate judge, and subsequently adopted the magistrate judge's findings and recommendations on the motions. The magistrate judge held that Florida law required that provision to be read as granting a reciprocal right to recovery of such attorney fees. See, e.g., Ajax Paving Indus. v. Hardaway Co., 824 So. 2d 1026, 1028 (Fla. Dist. Ct. App. 2002). That conclusion seems undisputed here. Florida courts treat such reciprocal provisions just like any contract provision, and thus will enforce the clause (i.e., by determining that one of the two parties prevailed) except in rare instances. In other words, the question is more "who prevailed" rather than "did someone prevail."

Under Florida law, the prevailing party is the "party prevailing on the significant issues in the litigation." Moritz v. Hoyt Enter., Inc., 604 So. 2d 807, 810 (Fla. 1992). Here, the magistrate judge determined that the significant issue in Ross's charging lien litigation was the dispute over the meaning of "value of the settlement." Ross contends that the significant issue was whether the engagement letter was an enforceable contract. However, the magistrate judge held that State Contracting's primary theory—both before and during the charging lien litigation—was that the contract was enforceable but that the value of the settlement was limited to the $8 million cash settlement. We discern no abuse of discretion in that determination, or in the district court's decision to award attorney fees to State Contracting.

05-1423,-1528                           18

Ross also argues that any award of attorney fees against him should be shared by Faro, since the court found that they were involved in a joint venture. We disagree. Whether or not Ross and Faro were joint venturers or joint obligees, each pursued his own charging lien, on his own behalf. Faro settled his claim with State Contracting, and Ross pursued his through litigation. Thus, State Contracting's attorney fees stemmed from Ross's efforts to enforce his own charging lien, not from efforts to enforce a charging lien on behalf of any joint venturer with whom he would share his award.

In sum, we affirm the judgment as to the charging lien, and we affirm the district court's award of attorney fees to State Contracting for its defense of Ross's charging lien claim. Each party shall bear its own costs for this appeal.

NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent. It is a public record.

# United States Court of Appeals for the Federal Circuit

05-1423, -1528

STATE CONTRACTING & ENGINEERING CORPORATION,

Plaintiff-Appellee,

v.

CONDOTTE AMERICA, INC. (formerly known as Recchi America, Inc.),
THE MURPHY CONSTRUCTION COMPANY,
THE HARDAWAY COMPANY, HUBBARD CONSTRUCTION COMPANY,
BALFOUR BEATTY CONSTRUCTION, INC.,
COMMUNITY ASPHALT CORPORATION
and HANSON PIPE & PRODUCTS SOUTHEAST, INC.
(formerly known as Joelson Concrete Pipe Company, Inc.)

Defendants,

v.

RICHARD S. ROSS, ESQ.,

Movant-Appellant.

DYK, Circuit Judge, concurring-in-part and dissenting-in-part.

I join the generally well-reasoned majority opinion except for Parts IV.C and V, from which I respectfully dissent. In part IV, the majority concludes that, even though Faro was discharged, he was still entitled to recover from the client fifty percent of the contingent fees under the original agreement with Ross, rather than the quantum meruit value of his services. In turn, says the majority, Ross is only entitled to recover one-half of the contingent fee.

The Florida cases make clear that in an action against the client (State Contracting) Faro, having been discharged by State Contracting without cause, was entitled to recover only the quantum meruit value of his services. See Rosenberg v.

<u>Levin</u>, 409 So.2d 1016, 1017 (Fla. 1982); <u>Adams v. Fisher</u>, 390 So.2d 1248, 1250 (Fla. Dist. Ct. App. 1980).  It follows under the Florida cases that Ross, who continued the work, was entitled to recover the remainder of the contingent fee in a suit against the client.  <u>See</u> <u>Adams</u>, 390 So. 2d at 1251 (finding that where the client discharged the initial attorney, the second attorney was entitled to the contingent fee).

In rejecting this approach, the majority relies on the agreement between Faro and Ross to divide the contingent fee equally.  I fail to see how that agreement can change the result under the Florida cases.  The Florida cases recognize that contingent fee arrangements often fail to deal explicitly with the possibility that a retained counsel may be discharged.  <u>See</u> <u>Rosenberg</u>, 409 So.2d at 1017; <u>Shupack v. Marcus</u>, 606 So.2d 466, 467 (Fla. Dist. Ct. App. 1992); <u>Adams</u>, 390 So.2d at 1250.  As noted, the default rule in Florida is that when an attorney is discharged without cause, he is entitled to recover only the quantum meruit value of his services in a suit against the client.  I see no reason why agreements among counsel as to the division of fees should be governed by a different default rule, and the Florida cases do not suggest that they are.  Moreover, the rule adopted in the Florida cases makes eminent sense.  For example, here if Faro had been discharged one day after the agreement was reached and after performing six hours of work under it, it would be unfair in the extreme that Faro should nonetheless receive one-half of the contingent fee when Ross spent years of work fulfilling the service obligations under the agreement with the client.  The court in <u>Adams</u> came to a similar conclusion where a client discharged his first attorney, with whom he had a contingent fee agreement, and then hired a second attorney under a separate

05-1423, -1528                                    2

contingent fee agreement. 390 So. 2d at 1249-50. As to the first attorney's fee, the court held:

> Upon discharge, the attorney has no right to collect his contingent fee. His fee is to be determined on a quantum meruit basis. <u>To allow the discharged attorney to collect his contingent fee would be inequitable.</u> It might cause the client to pay an excessive fee without receiving the full benefits of counsel in violation of the Florida Code of Professional Responsibility DR 2-106(A).

Id. at 1250 (internal citation removed) (emphasis added).

Significantly, Faro himself, in seeking dismissal of his charging lien pursuant to the settlement with State Contracting, explicitly agreed that he would only have been entitled to quantum meruit recovery. Reply in Support of Faro's Petition for Disbursement of Settlement Sum from Court Registry (Doc. 503) at 2 ("Florida law allows a discharged attorney on a contingency case to collect only quantum meruit whereas an attorney employed under a contingency contract gets the full contracted fee."); id. at 4.

The majority appears to agree that in some circumstances Ross would be entitled to the contingent fee less Faro's quantum meruit recovery, but suggests that two circumstances here render that result inequitable, namely the advanced stage of the litigation, and Ross's effort to secure Faro's discharge. I do not read the decision below as resting on these grounds, nor do the Florida cases suggest that the result should turn on such considerations. In any event, the facts here do not suggest that full recovery by Ross is somehow unfair. While only four months work remained, the work that Ross did without Faro's assistance was substantial. After Faro was discharged, Ross handled the appellate proceedings in the case, including an oral argument before

05-1423, -1528                                    3

this court. Ross was also responsible for preparing the case for trial, on the eve of which, the client decided to settle.

Moreover, the desire to terminate the relationship between Faro and Ross was mutual; they simply found it impossible to work together. Here the magistrate judge found that both Faro and Ross had attempted to persuade the client to discharge the other. Faro, for example, privately met with the client to suggest a replacement for Ross. When that attempt failed, Faro—without the client's approval—sent Ross a letter purporting to discharge Ross. For his part, Ross gave the client an ultimatum: the client would have to either discharge Faro, Ross, or the both of them. That Ross ultimately prevailed in convincing the client to discharge Faro in this situation should have no bearing on the allocation of fees. Under these circumstances, I see no basis for denying recovery of the full contingent fee to Ross less whatever Faro's quantum meruit recover should have been (which amount may be significantly different from the amount that State Contracting agreed to pay Faro in settlement).

In summary, I respectfully dissent from Part IV.C. of the majority opinion. In my view, Ross is entitled to the full contingent fee less any quantum meruit recovery to which Faro was entitled. I would remand for a determination of the correct amount of the fee award. As a result, I also dissent from Part V of the majority opinion, as I would vacate the district court's award of prevailing party fees to State Contracting.